


IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| LAURA BIRDSALL<br>Plaintiff,<br><br>V.<br><br>TAT & G LLC<br>and<br>RYAN SCHMIDT<br>Defendants. | Case No. _____<br><br>JURY TRIAL DEMANDED |

PARTIES TO THIS ACTION

1. Plaintiff Laura Birdsall resides at 2607 Goodwood Road in Baltimore City.

2. Plaintiff is representing herself pro se.

3. Defendant Tat & G LLC is located and receives mail at 3003 Montebello Terrace in Baltimore City.

4. Defendant Tat & G LLC is represented by Mr. Daniel Doty.

5. Defendant Ryan Schmidt's last known residence is 3112 Juneau Place in Baltimore City.

6. Mr. Doty is authorized to accept service of process for Defendant Schmidt.

7. Defendant Tat & G LLC is a Limited Liability Company organized under the laws of the State of Maryland and at all relevant times was Plaintiff's employer.

8. Defendant Tat & G LLC ("Zeke's") operates at times under the names of Zeke's Coffee and Zeke's Roasting Facility.

9. At all relevant times, Defendant Ryan Schmidt was the General Manager and in charge of all operations at Zeke's Roasting Facility.

10. At all relevant times, Zeke's employed more than fifteen (15) employees.

11. At all relevant times, Zeke's engaged in interstate commerce.

12. At all relevant times, Zeke's had a total annual sales volume of $500,000 or more, upon information and belief.

JURISDICTION AND VENUE

13. This court has jurisdiction over this matter, pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

14. The venue in this matter is proper under 28 U.S.C. § 1391.

EXHAUSTION OF FEDERAL ADMINISTRATIVE REMEDIES

15. Plaintiff has complied with all conditions precedent to filing of her claims pursuant to 42 U.S.C. § 1201 et seq; a timely charge of discrimination was filed with the Baltimore Field Office of the Equal Opportunity Employment Commission ("EEOC") within 300 days of the last ADA violation and the last Title VII violation. One hundred eighty (180) days have not yet expired following the filing of the charge. Ninety (90) days have not yet expired following the issuance of the right to sue.

FACTS

16. Plaintiff became employed by defendant on May 17th, 2022 and worked until she was unlawfully terminated by constructive discharge on November 12th, 2022.

17. Plaintiff and Zeke's entered into an employment agreement together providing that Plaintiff would be employed at the Zeke's Roasting Facility without a specific job title.

18. Plaintiff's duties included putting coffee beans into paper bags, closing paper bags, sealing paper bags, putting stickers on paper bags, stamping numbers on paper bags, washing production equipment in a large sink, cleaning the large sink, putting paper bags of coffee into shipping boxes, lifting shipping boxes into shipping vans, roasting coffee beans in an industrial convection oven, notifying management when the oven caught on fire, mixing coffee beans in a large spinning plastic drum, and selling cups of coffee at farmers markets. She was also expected to perform any and all duties as assigned by Zeke's management.

19. Plaintiff was qualified for all of these jobs and performed them in a competent and professional manner.

*Zeke's Culture*

20. During Plaintiff's employment, Zeke's had no Human Resources department, no formal system of recording complaints, and no formal personnel grievance policy.

21. Zeke's did not distribute an employee handbook to new employees, nor did it make an employee handbook available to existing employees.

22. The environment at Zeke's was often described by employees as male-dominated and was frequently compared to that of a fraternity house.

23. Zeke's had alcohol on hand at most or all times during Plaintiff's employment. Employees were openly permitted to consume alcohol on the clock. The walk-in refrigerator intended for product storage was often also stocked with cases of beer.

24. All persons in management and supervisory roles were male.

25. Male employees outnumbered female employees at the roasting facility.

26. Female employees were often secluded with one or more male employees while on the clock.

*Zeke's Management*

27. During Plaintiff's employment, Zeke's Roasting Facility had two production supervisors, Mr. Dale Brown and Mr. Jared Sweeney.

28. Zeke's Roasting Facility had one General Manager, Defendant Ryan Schmidt.

29. Zeke's Roasting Facility was owned by Mr. Thomas Rhodes.

30. Upon information and belief, Mr. Rhodes is Defendant Schmidt's uncle.

31. Upon information and belief, Mr. Sweeney is Defendant Schmidt's childhood friend.

*Secrecy and Physical Environment at Zeke's*

32. Zeke's roasting facility operates both as a factory producing roasted coffee beans, as well as a production warehouse and wholesale delivery service.

33. During Plaintiff's employment, the machinery and speakers at Zeke's regularly surpassed eighty-five (85) decibels, per the Decibel Meter iPhone application.

34. During Plaintiff's employment, this machinery and these speakers ran for most of the day.

35. The physical layout of the warehouse and roasting facility, in addition to its being used as storage for inventory and broken equipment, as well as the presence of sofas and chairs in corners, allowed for near total secrecy in interactions between employees, often making it impossible for managers and witnesses to see or hear harassment when it occurred.

36. Defendant Schmidt and Supervisor Mr. Sweeney occupied offices with small internal windows providing limited views of employee workspace.

*Incidents with Mr. Sweeney*

37. Mr. Sweeney began by aggressively chastising Plaintiff for small errors, such as not aligning time punches on a time card and using too much packing paper in a package.

38. In late June, 2022, Plaintiff inquired with Defendant Schmidt, Zeke's General Manager, about Mr. Sweeney's behavior. She asked him if her own performance was lacking.

39. Defendant Schmidt handled all HR-related concerns at the roasting facility.

40. Upon information and belief, Defendant Schmidt had no training or certification in Human Resources.

41. Defendant Schmidt attested to Plaintiff that Mr. Sweeney was a childhood friend and, "had been the best man," at Defendant Schmidt's wedding.

42. Defendant Schmidt responded that Mr. Sweeney was having "issues" with his girlfriend and posited that Mr. Sweeney's behavior was unrelated to Plaintiff's job performance.

43. Mr. Schmidt suggested that Mr. Sweeney's conduct was instead due to a bad mood caused by his relationship issues.

3

44. Defendant Schmidt advised Plaintiff that her performance was not lacking and to "ignore" Mr. Sweeney.

*Nonconsensual Touch by Mr. Sweeney*

45. On or around July 12th, 2022, Mr. Sweeney became agitated when Plaintiff approached him to ask a question while he was filling orders.

46. Mr. Sweeney physically pushed Plaintiff out of his way by placing his left hand on her right arm and exerting force.

47. Plaintiff recounted incident to supervisor Mr. Dale Brown on or around the last week of July, 2022.

48. The incident became a subject of conversation at Zeke's and was ultimately reported to Defendant Schmidt by another employee, delivery person and survivalist Jim Gray, on or around the last week of July 2022, upon information and belief.

49. Plaintiff then reported the incident herself to Defendant Schmidt on July 30th, 2022.

50. Thomas Rhodes, the owner of Zeke's, telephoned Plaintiff on August 1st, 2022.

51. Mr. Rhodes apologized for Mr. Sweeney's conduct.

52. He attested that he had spoken to his attorney and asked Plaintiff if she were content simply not being scheduled with Mr. Sweeney going forward.

53. Mr. Sweeney had recently reduced his schedule to 2-3 days per week.

54. Plaintiff agreed to Mr. Rhodes' proposal and for a short time was no longer scheduled to work with Mr. Sweeney.

55. At this time, Plaintiff ascertained that the work environment at Zeke's may be more chaotic than she had initially understood and began to keep detailed records of her interactions with Zeke's colleagues and management.

*Plaintiff Supports Female Colleague's Complaint*

56. On September 18th, 2022, Plaintiff's female colleague recounted to Plaintiff that Mr. Sweeney had become verbally aggressive with her after she filled a delivery van with the wrong type of fuel.

57. Plaintiff offered to join her female colleague in filing another complaint regarding Mr. Sweeney's conduct.

58. Later on the same day, Zeke's owner Mr. Thomas Rhodes and his nephew, Defendant Schmidt, drove to the Roasting Facility set up four folding chairs in the parking lot.

59. During a meeting in the parking lot, Plaintiff and Ms. Schroeder complained to Mr. Rhodes and Defendant Schmidt about Mr. Sweeney's erratic and aggressive behavior.

4

60. Both Defendant Schmidt and Mr. Rhodes attested that Mr. Sweeney's behavior was due to his ongoing conflicts with his girlfriend, but could not be extrapolated to be understood as directed at women in general.

61. Defendant Schmidt offered to "talk to" Mr. Sweeney.

62. Mr. Rhodes concurred that the best course of action was for Mr. Schmidt to "talk to" Mr. Sweeney.

*Plaintiff Subjected to Sexual Harassment*

63. Plaintiff was subjected to sexual harassment on multiple occasions by Mr. Daniel Benbow, another employee without a specific job title.

64. Mr. Benbow was tasked with training Plaintiff on how to use roasting machinery to roast coffee beans.

65. Mr. Benbow advised Plaintiff that although OSHA regulations did not allow employees to lift one hundred and fifty (150) pound bags of green, unroasted coffee beans, he enjoyed doing so anyway because he, "used to be a power lifter."

66. Mr. Benbow advised plaintiff that other men find him intimidating because he is "strong."

67. Although Plaintiff was taller in height than Mr. Benbow, Mr. Benbow was significantly larger and stronger than Plaintiff to a degree evident by body weight.

68. Plaintiff was physically intimidated by Mr. Benbow.

69. The "Roast Room" was the loudest and most isolated area of the roasting facility.

70. As Mr. Benbow became more familiar with Plaintiff, he began gently touching her arms, legs, and hips while working alongside her.

71. Plaintiff did not return Mr. Benbow's advances.

72. On Saturday, September 3rd, Mr. Benbow chastised Plaintiff for stepping on a canvas sack of unroasted coffee beans to evade his advances.

73. On Saturday, September 10th, Mr. Benbow approached Plaintiff while she was labelling bags at the "label table," placed his face within a few inches of her ear, and whispered, "I can't get you out of my head."

*Plaintiff Subjected to Quid Pro Quo Sexual Harassment*

74. On September 25, 2022, Mr. Benbow was scheduled to work in Production at Zeke's while Plaintiff was scheduled to roast coffee beans in the "Roast Room." Because both parties were trained in both job duties, Plaintiff asked Mr. Benbow if he would be willing to trade job duties for the day with the consent of their supervisor.

75. Mr. Benbow responded that he would trade duties if Plaintiff would give him a "hug."

76. Mr. Benbow then embraced Plaintiff before she offered a response, pressing his face against hers.

77. Plaintiff did not return Mr. Benbow's embrace.

78. Mr. Benbow, upon noticing Plaintiff's reluctance to his advances, then began to admonish her about the quality of her work.

79. When Plaintiff made clear that this feedback was not welcome, Mr. Benbow and Plaintiff entered a brief verbal altercation. Mr. Benbow then finally left the area.

*Plaintiff Reports Harassment to Mr. Brown*

80. On September 25th, 2022, Plaintiff immediately reported Mr. Benbow to Dale Brown, her supervisor.

81. On September 30th, 2022, Plaintiff again approached Mr. Brown express discomfort with Mr. Benbow's actions, as the incident had become a subject of gossip rather than investigation or correction.

82. Mr. Brown said, "it looks like you just have a problem with men."

83. Mr. Brown continued that, "[Mr. Benbow] is a standup guy, he paints his nails and does stuff with kids."

84. When Plaintiff protested that this should not allow him to sexually harass his coworkers, Mr. Brown again attested, "It really just looks like you have a problem with men. That's just what I'm saying it looks like."

85. On the same day, Plaintiff encountered Defendant Schmidt outside as she left for her break.

86. Plaintiff recounted her exchange with Mr. Brown to Defendant Schmidt.

87. Plaintiff initiated a text exchange beginning on October 2nd, 2022, and ending on October 3rd, 2022, with Mr. Benbow, asking him not to touch her and invoking her rights under the EEOC.

*Plaintiff Reports Harassment to Defendant Schmidt*

88. On October 3rd, 2022, Plaintiff asked for a private meeting with Defendant Schmidt.

89. At this meeting, Plaintiff reported Mr. Benbow's sexual harassment to Defendant Schmidt.

90. Defendant Schmidt countered that Mr. Benbow, "had been [Mr. Schmidt's] friend for a long time before he even worked at Zeke's." He attested that Mr. Benbow was a, "good guy," and then, in a tone of exasperation said, "nobody here wants to hurt you." Defendant Schmidt then again said, "I don't know what to tell you."

*Plaintiff Seeks ADA Protection*

91. During this same meeting, Plaintiff disclosed to Defendant Schmidt that she suffered from Post-traumatic Stress Disorder. She disclosed that she was actively in treatment for this disorder. She offered to furnish a doctor's note.

92. Plaintiff explained to Defendant Schmidt that it was important for the treatment of her disability that she not be subjected to unnecessary nonconsensual touch and groping by her coworkers.

6

93. Plaintiff asserted her rights under the EEOC and the Americans With Disabilities Act and said that regardless of other employees' psychological intent, it was nonetheless important that they avoid nonconsensually touching or groping her.

94. Plaintiff asserted to Defendant Schmidt that nonconsensual touch increased and worsened the symptoms of her disability.

95. After her meeting with Defendant Schmidt, Plaintiff sent Defendant Schmidt a letter from her treating physician confirming her diagnosis with Post-traumatic Stress Disorder. This letter was dated October 11th, 2022.

96. On or approximately one week after the letter's being postmarked, Plaintiff verbally confirmed with Defendant Schmidt that he had received the letter.

97. Defendant Schmidt did not offer to enter an iterative process with Plaintiff and did not offer to investigate Plaintiff's report or to intervene.

*Mr. Benbow Charged with Assault*

98. On December 16, 2022, Mr. Benbow was charged by the State of Maryland with sexually assaulting Plaintiff's female colleague at a secluded location while on the clock at Zeke's. Mr. Benbow first approached Plaintiff's female colleague in the same manner he had approached Plaintiff.

99. Mr. Benbow's assault against Plaintiff's colleague is being tried in the District Court of Maryland for Baltimore City, Case Number 0B02465148.

*Defendant Schmidt Again Allows Mr. Sweeney to Supervise Plaintiff*

99. Shorty after reporting Mr. Benbow and furnishing a letter from her treating physician to Defendant Schmidt, Plaintiff discovered that she was again being scheduled to work several shifts a week with Mr. Sweeney.

100. At all relevant times, Defendant Schmidt had authority over the roasting facility staff and management schedules.

101. At all relevant times, Mr. Sweeney was responsible for creating and distributing the roasting facility staff schedule.

102. Plaintiff asked supervisor Mr. Brown why she was being scheduled to work with Mr. Sweeney after the agreement she made with Mr. Rhodes.

103. Mr. Brown responded, "ask Ryan," referring to Defendant Schmidt.

104. Plaintiff was too intimidated to approach Defendant Schmidt, as coworkers had reported that he had become increasingly frustrated with Plaintiff's reporting his friends.

*Mr. Sweeney Cuts Plaintiff's Hours*

105. Although Mr. Brown was Plaintiff's formal supervisor, in late September, 2022, Mr. Sweeney began give Plaintiff instructions to stop working on tasks Mr. Brown had directed her to complete.

106. On at least two occasions, Mr. Sweeney told Plaintiff to go home before Mr. Brown had asked her to leave.

107. Although Plaintiff's hours were being cut, Mr. Brown advised Plaintiff to listen to Mr. Sweeney when this happened, as Mr. Sweeney technically outranked him.

*Plaintiff Harassed by Mr. Sweeney*

108. On November 11, 2022, Plaintiff was standing at the "hopper," a machine that weighs and dispenses coffee beans, weighing, filling, and sealing bags of coffee.

109. At around 2:30pm, Mr. Brown, Plaintiff's scheduled supervisor, left the premises to pick up his son from school.

110. Shortly after Mr. Brown left, Mr. Sweeney descended from his office and began walking around Plaintiff.

111. After approximately two minutes, Mr. Sweeney entered Plaintiff's workspace.

112. Mr. Sweeney began to berate Plaintiff's work, telling her that the bags she was sealing weren't "tight enough."

113. Plaintiff asked Mr. Sweeney how the bags could be tighter, as Mr. Brown, her supervisor, had recently said that her bags were, "looking perfect."

114. Mr. Sweeney forced Plaintiff to begin sealing bags in front of him until she could produce a bag that he considered tight enough, continuing to admonish her that customers would not be happy unless she could produce a, "tight enough bag."

115. During this tirade, Mr. Sweeney placed himself approximately four inches from Plaintiff's face.

116. Plaintiff could feel and smell Mr. Sweeney's breath.

117. Mr. Sweeney's speech was rapid and uninhibited.

118. On two occasions, Plaintiff took a large step backward to remove herself from Mr. Sweeney's body space.

119. On both occasions, Mr. Sweeney stepped forward to close the physical gap between himself and Plaintiff.

120. At one point, Mr. Sweeney's grip on a bag slipped and his left arm bumped into Plaintiff's torso. Mr. Sweeney stated, "oops." At this point, Plaintiff began crying.

121. Finally, Plaintiff stepped away from Mr. Sweeney and ascended the stairs to Defendant Schmidt's office.

122. Plaintiff reported Mr. Sweeney's actions to Defendant Schmidt while crying.

123. Mr. Schmidt responded, "I don't know what to tell you," and stared at Plaintiff.

124. Plaintiff asked Defendant Schmidt to use his authority as General Manager to prevent her from being harassed and touched by Mr. Sweeney and Mr. Benbow.

125. Mr. Schmidt again attested to Plaintiff that he had nothing to say.

126. At the 3pm fifteen-minute break, Plaintiff left the roasting facility to sit in her car because she was afraid of Mr. Sweeney.

127. At this time, Plaintiff texted Defendant Schmidt advising him that she would not return to the warehouse while Mr. Sweeney was present, but that she would come back inside if Mr. Sweeney left.

128. At 3:14pm, Mr. Schmidt texted Plaintiff, "okay." He did not respond in any other capacity.

129. Plaintiff sat in her car outside the roasting facility until the end of her shift forty-five (45) minutes later.

*Retaliation Follows*

130. While Plaintiff sat in her car out of fear of Mr. Sweeney on November 11th, 2022, Mr. Schmidt and Mr. Sweeney disparaged Plaintiff openly in front of other non-managerial employees, upon information and belief.

131. Defendant Schmidt and Mr. Sweeney mocked Plaintiff, saying that rather than having a disability, she simply, "can't take directions."

132. Defendant Schmidt did not treat Plaintiff's disability with confidentiality or concern.

133. Defendant Schmidt also chose to mock and belittle disabled Plaintiff with his friend Mr. Sweeney.

134. Upon information and belief, Mr. Sweeney both berated and laughed at Plaintiff while on break with Defendant Schmidt.

135. These actions were immediately retaliatory to Plaintiff's complaint about Mr. Sweeney only minutes earlier.

*Last incident with Mr. Schmidt*

136. On the morning of November 12th, 2022, Plaintiff arrived at the warehouse and Roasting Facility shortly after 5am to prepare for the farmer's market in Fells Point.

137. Plaintiff's colleague Denis Doxy approached Plaintiff to advise her that, "if you want to work at Zeke's, don't say nothing bad about Ryan's friends."

138. Plaintiff believes Mr. Doxy offered this counsel in a spirit of kindness and concern.

139. As Plaintiff and her colleagues prepared, they discovered that the automatic locking system on one of the vans had malfunctioned and that many of Mr. Doxy's supplies were inaccessible.

140. In a group text with management, Plaintiff offered to use her personal AAA account to unlock the van so that Mr. Doxy could arrive at the Waverly Farmer's Market on time.

141. Management did not respond to these texts.

142. Defendant Schmidt arrived in person shortly thereafter to examine the van.

*Plaintiff Wrongfully Terminated by Constructive Discharge*

143. While Defendant Schmidt was on site to examine the van, Plaintiff approached him regarding his and Mr. Sweeney's actions the day before.

144. Plaintiff expressed to Defendant Schmidt she did not feel safe at Zeke's anymore and felt that he had not taken her complaints seriously.

145. Plaintiff and Defendant Schmidt were standing outside of Zeke's warehouse in between two delivery vans.

146. Defendant Schmidt became visibly agitated at Plaintiff's inquiry. He moved toward Plaintiff and began to loudly say her name over and over, repeating, "Laura, Laura, Laura, Laura, Laura, Laura."

147. Plaintiff physically retreated from Defendant Schmidt.

148. Plaintiff again expressed her fear and discomfort at Zeke's and again began crying.

149. Defendant Schmidt exclaimed, "Nobody did anything to you! I can see everything!"

150. Although Defendant Schmidt was petite in stature, his anger and yelling were loud and intense.

151. It was still dark out and Plaintiff was standing with Defendant Schmidt in a secluded location.

152. Defendant Schmidt's statements were aggressive and incoherent to Plaintiff.

153. Plaintiff left the premises for her safety although she had been excited to work at the farmer's market.

154. Defendant Schmidt yelled, "good luck!" as Plaintiff got in her car.

155. Plaintiff's involuntary resignation resulted from the intolerable working conditions created by Defendant Schmidt, Mr. Sweeney, and Mr. Benbow.

156. Plaintiff's involuntary resignation was directly prompted by retaliatory harassment from General Manager Ryan Schmidt.

COUNT I
TITLE VII – HOSTILE WORK ENVIRONMENT HARASSMENT
42 U.S.C. 2000e
(Defendant Zeke's)

157. Plaintiff incorporates by reference paragraphs 1 through 156 as though fully set forth herein at length.

158. Plaintiff was a woman in a male-dominated workplace.

159. Plaintiff was subjected to multiple instances of harassment by Mr. Sweeney and Mr. Benbow on the basis of her sex.

10

160. The harassment was pervasive and severe.

161. The harassment Plaintiff suffered was sufficiently severe or pervasive to alter the conditions of employment and unreasonably interfere with her work performance and cause Plaintiff emotional distress, humiliation, and embarrassment.

162. Defendant either knew or should have known about the harassment and failed to take corrective measures.

163. As a result of Defendants' actions, Plaintiff is entitled to recover damages including compensatory damages, back wages, front pay, punitive damages, attorney's fees and costs.

## COUNT II
### TITLE VII – HOSTILE WORK ENVIRONMENT – OPPOSITION
### 42 U.S.C. 2000e
### (Defendant Zeke's)

164. Plaintiff incorporates by reference paragraphs 1 through 163 as though fully set forth herein at length.

165. Plaintiff engaged in protected activity by opposing misconduct by Mr. Sweeney and Mr. Benbow on behalf of herself and her female colleague.

166. Plaintiff's exercise of protected activity was known to Defendant.

167. Defendant thereafter took an adverse employment action against Plaintiff.

168. A causal connection existed between the Plaintiff's protected activity and the adverse employment action.

169. As a result of Defendant's actions, Plaintiff is entitled to recover damages including compensatory damages, back wages, front pay, punitive damages, attorney's fees, and costs.

## COUNT III
### TITLE VII – RETALIATION
### 42 U.S.C. 2000e
### (Individual Defendants)

170. Plaintiff incorporates by reference paragraphs 1 through 169 as though fully set forth herein at length.

171. On more than on occasion, Plaintiff reported harassment by supervisor Jared Sweeney to Defendant Schmidt.

172. On more than one occasion, Plaintiff reported harassment by colleague Daniel Benbow to Defendant Schmidt.

173. Defendant Schmidt repeatedly asserted to Plaintiff that these individuals were his personal friends.

174. Defendant Schmidt unlawfully retaliated against Plaintiff by reversing Mr. Rhodes' decision to prohibit Mr. Sweeney from working with Plaintiff. Defendant Schmidt's decision directly followed Plaintiff's reporting Mr. Benbow.

175. Defendants unlawfully retaliated against Plaintiff by mocking her in front of colleagues for reporting Mr. Sweeney.

176. Defendants unlawfully retaliated against Plaintiff by wrongfully terminating Plaintiff through constructive discharge.

177. Defendants' violations were willful and deliberate.

178. As a result of Defendants' actions, Plaintiff is entitled to recover damages including back wages, liquidated damages, attorney's fees, and costs.

COUNT IV
FAIR LABOR STANDARDS ACT – RETALIATION
29 U.S.C. § 201 et seq.
(Individual Defendants)

179. Plaintiff incorporates by reference paragraphs 1 through 178 as though fully set forth herein at length.

180. Plaintiff is an "employee" within the meaning of the Fair Labor Standards Act, 29 U.S.C. § 201, et seq.

181. Defendant Zeke's is an "enterprise engaged in commerce" within the meaning of the Fair Labor Standards Act, 29 U.S.C. § 201, et seq.

182. Defendant Ryan Schmidt is an "employer" within the meaning of the Fair Labor Standards Act, 29 U.S.C. § 201, et seq.

183. Plaintiff reported harassment by a supervisor.

184. Plaintiff reported harassment by a colleague.

185. Defendant Schmidt unlawfully retaliated against Plaintiff by reversing Mr. Rhodes' decision to prohibit Mr. Sweeney from working with Plaintiff and instead forcing her to work more hours with the supervisor who harassed her.

186. Defendant Schmidt unlawfully retaliated against Plaintiff by disparaging her to his employees.

187. Defendant Schmidt unlawfully retaliated against Plaintiff by wrongfully terminating Plaintiff through constructive discharge.

188. Defendants acknowledged they had no official policy governing personnel complaints.

189. Defendants' violations were willful and deliberate.

190. As a result of Defendants' actions, Plaintiff is entitled to recover damages including back wages, liquidated damages, attorney's fees, and costs.

## COUNT V
## CONSTRUCTIVE DISCHARGE
(Defendant Zeke's)

191. Plaintiff incorporates by reference paragraphs 1 through 190 as though fully set forth herein at length.

192. Plaintiff made repeated attempts to seek recourse for harassment and intimidation from a supervisor an a colleague.

193. Defendant Schmidt responded by asserting his personal friendships with the parties being reported.

194. Defendant Schmidt allowed and encouraged harassment of Plaintiff to continue and worsen.

195. Harassment from Mr. Sweeney and Mr. Benbow, coupled with Defendant Schmidt's support thereof, were aggressive, hostile, and intimidating to such an extreme extent that Plaintiff feared for her safety.

196. Defendants either had or should have had knowledge of Plaintiff's intolerable working conditions.

197. The working conditions at Zeke's were so intolerable that a reasonable person in Plaintiff's position would feel compelled to resign.

198. Defendants forced Plaintiff's involuntary resignation.

## COUNT VI
## WRONGFUL TERMINATION
## 42 U.S.C. 2000e
(Defendant Zeke's)

199. Plaintiff incorporates by reference paragraphs 1 through 198 as though fully set forth herein at length.

200. Plaintiff opposed the illegal conduct of Defendant Schmidt's personal friends and made multiple complaints thereon.

201. Defendant thereafter took an adverse employment action against Plaintiff.

202. A causal connection existed between the Plaintiff's protected activity and the adverse employment action.

203. Plaintiff was terminated for actions that public policy would encourage.

204. As a result of Defendant's actions, Plaintiff is entitled to recover damages including compensatory damages, back wages, front pay, punitive damages, attorney's fees, and costs.

## COUNT VII
## AMERICANS WITH DISABILITIES ACT – HOSTILE WORK ENVIRONMENT HARASSMENT
## 42 U.S.C. 12101, et seq.
(Defendant Zeke's)

205. Plaintiff incorporates by reference paragraphs 1 through 204 as though fully set forth herein at length.

206. At all material times Defendant Zeke's was an employer as defined by the Americans with Disabilities Act (ADA), 42 U.S.C. 12111.

207. Plaintiff was a qualified person with a disability.

208. Plaintiff was otherwise qualified to perform all job requirements with or without an accommodation.

209. Plaintiff disclosed disability to Defendant.

210. Nonconsensual touch, while also prohibited by other statutes, habitually worsens symptoms of Plaintiff's disability.

211. Plaintiff informed Defendant that nonconsensual touch worsened the symptoms of her disability.

212. Plaintiff's treating physician sent a letter confirming Plaintiff's disability to Defendant.

213. Defendant refused enter an iterative process with Plaintiff to determine accommodations whereby Plaintiff would not be pushed or groped, regardless of the intent of those pushing and groping.

214. The harassment Plaintiff suffered was sufficiently severe or pervasive to alter the conditions of employment and unreasonably interfere with her work performance and cause Plaintiff emotional distress, humiliation, and embarrassment.

215. Defendant either knew or should have known about the harassment and failed to take corrective measures.

216. As a result of Defendants' actions, Plaintiff is entitled to recover damages including compensatory damages, back wages, front pay, punitive damages, attorney's fees and costs.

## COUNT VIII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Individual Defendants)

217. Plaintiff incorporates by reference paragraphs 1 through 216 as though fully set forth herein at length.

218. The Defendants engaged in intentional or reckless conduct against the Plaintiff.

219. The Defendants' conduct was so outrageous that it is not to be tolerated by a civilized society.

220. The Defendants' conduct has resulted in severe emotional distress to the Plaintiff.

221. As a result of Defendants' actions, Plaintiff is entitled to recover damages.

## COUNT IX
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESSS
### (Individual Defendants)

222. Plaintiff incorporates by reference paragraphs 1 through 221 as though fully set forth herein at length.

223. The Defendants owed a duty to the Plaintiff.

224. The Defendants breached their duty.

225. Plaintiff suffered severe emotional injury because of Defendants' breach.

226. Defendant's breach was the factual and legal cause of Plaintiff's injuries.

227. As a result of Defendant's actions, Plaintiff is entitled to recover damages.

WHEREFORE Plaintiff respectfully requests judgment in her favor and specifically:

1. A jury trial

2. Compensatory Damages

3. Back pay

4. Front Pay

5. Liquidated Damages

6. Punitive Damages

7. Legal fees and expenses

8. Attorney's fees and expenses if Plaintiff retains counsel

9. Pre-judgment interest and, if applicable, post judgment interest; and

10. Such other legal or equitable relief to which she may be entitled.


Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law; (3) the factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

/s/ *L. Birdsall*
Laura Birdsall
2607 Goodwood Road
Baltimore, MD 21214
818-422-5750
laurabirdsall@gmail.com

15